IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TYLER DAWSON | * | |
| Plaintiff | * | |
| v | * | Civil Action No. PJM-12-110 |
| JOHN S. WOLF, *et al.* | * | |
| Defendants | * | |

\*\*\*

**MEMORANDUM**

Pending is Defendants' Motion to Dismiss or for Summary Judgment. ECF No. 32. Plaintiff's correspondence docketed September 4, 2012, shall be construed as his opposition to the motion. ECF No. 34. The Court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011).

**Background**

The allegations raised by Plaintiff relate to his claim that in 2008, while he was incarcerated at Western Correctional Institution (WCI) a group of officers[1] put a rope around his neck and beat him. He alleges this was done because one of the officers, Officer Elliot, was a member of the Ku Klux Klan and is related to a girl whom Plaintiff is accused of raping.[2] Plaintiff claims that as a result of the rope around his neck, his throat was injured. He describes

---

[1] None of the officers alleged to have beaten Plaintiff are named as Defendants in this case.

[2] Plaintiff's allegations are somewhat convoluted and hard to follow, but the gist of his assertions are that no one believes he really raped the girl whom he was convicted of raping, who is African American, so a false story alleging that he raped a white girl was promoted. He claims the purpose of the lie was to enrage correctional officers who would then take their anger out on him. The story was started, according to Plaintiff, by the father of the girl he was convicted of raping and his relatives. Plaintiff claims that he is innocent of the charges against him and that the girl was actually raped by her father. He states that nobody in his hometown believes he is guilty.

the condition of his throat as being very red and appearing as if there is a bone in it. He asserts there is a widespread conspiracy to keep him from obtaining appropriate medical care for the injury to his throat which includes members of the psychology department. ECF No. 1 and 4.

Plaintiff explains that prior to his criminal trial he was confined to Clifton T. Perkins Hospital to determine if he was competent to stand trial. ECF No. 10. He claims he was there for only one day and, while there, certain staff members told him they were going to make certain bad things happen to him when he was sent to the Division of Correction.[3] Plaintiff asserts that these same staff members have followed him to every institution and informed correctional staff that he is crazy. The initial injury to his neck was blamed on a suicide attempt which Plaintiff attributes, in part, to the efforts by both the correctional officers who assaulted him and the staff at Perkins to portray him as mentally ill. ECF No. 4.

Plaintiff claims the condition of his throat has worsened and threatens his life. He states his symptoms include spitting up blood, shaking attacks, chest discomfort, choking, and sweating. Plaintiff was sent to Baltimore Washington Medical Center when he was found unconscious in his cell and, upon regaining consciousness, claimed he could not speak. Hospital staff ordered a CT Scan of his throat and, Plaintiff claims, medical staff lied and said it showed no abnormality. As evidence that this diagnosis was incorrect, Plaintiff has submitted a copy of a letter written by Commissioner of Correction Stouffer to Congressman Elijah Cummings stating that Plaintiff was diagnosed with a "prominent epiglottis." ECF No. 10 at Att. 2.[4] In

---

[3] Plaintiff also claims that while he was at Perkins he was railroaded into pleading guilty to a robbery charge, but when he got to court he discovered the case also included a rape charge. He claims if he had known the charge was included in the guilty plea he would have stood trial on the charge and been acquitted. He asserts his public defender chose not to fight for him.

[4] The letter also explains that Plaintiff's claims regarding his throat have been extensively investigated and states there is no evidence that he is being denied needed medical care. Further, the letter states that Plaintiff was offered psychotropic medication after a psychological evaluation determined he would benefit from same, but Plaintiff has consistently refused to take the prescribed medication. ECF No. 10 at Att. 2.

addition to the condition of his throat, Plaintiff states that he has migraines which started after he had eye surgery. He asserts that he should be sent for tests to determine if he has a brain tumor, but members of the medical staff have refused to order such tests. ECF No. 1 at p. 8. Plaintiff claims that he is losing eye sight in his good eye and the eye doctor will not help him because Plaintiff is African-American. Plaintiff had surgery for chronic retinal detachment in 2006. ECF No. 14 at Att. 1.

Plaintiff also alleges that his safety is threatened because correctional officers assigned to his housing unit are allowing inmate workers to be out on the administrative segregation tier when food is being delivered to the inmates who are assigned there. Plaintiff states that he is in administrative segregation at Jessup Correctional Institution (JCI) because there is no protective custody unit there and he has issues with prison gang members. He states the inmate workers are allowed to "mess with" his food, placing cleaning products in his food. In addition, he claims that correctional officers put things in his food. He states that for a while he simply refused to eat his meals, but his refusal of food was interpreted as an effort to commit suicide. Plaintiff claims that he now eats his food regardless of whether he sees someone "messing with it." He claims much of the time it tastes like there is soap in his food and on one occasion a black inky substance was put into his food. ECF No. 1. He further alleges that on some occasions medication is put into his food which makes him dizzy and puts him to sleep. *Id*. He claims Officers Boating-Sampong, Hall, Adejumo, Sanni, Osogbuy, Jaff, and Breathson have all participated in tampering with his food. He also states the officers on the 7:00 to 3:00 shift always let inmates out to work during feed-up which is a violation of regulations given Plaintiff is housed in administrative segregation for purposes of protecting him from inmate gang members with whom he claims he is "beefing." ECF No. 4 at p. 8. Plaintiff urges this Court to

review the recordings made from the cameras stationed in the housing unit because it would reveal that people are in fact tampering with his food. He claims his tray is easy to target for tampering because it is a medical tray. As a result of the alleged food tampering, Plaintiff claims his mouth has broken out with bumps. ECF No. 1 at p. 9.

### Injunctive Relief

Plaintiff seeks a Restraining Order and alleges that Defendants are intercepting his outgoing mail, opening his legal mail outside of his presence, and are withholding the envelopes from his legal mail. ECF No. 25. In addition he claims he is being denied a transfer to another institution in retaliation for filing the instant case. *Id*. A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain a preliminary injunction, a movant must demonstrate:  1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 374 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, _U.S. _, 130 S.Ct. 2371, 176 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

Plaintiff's ability to have mail sent out from the institution does not appear to have been adversely effected when the docket in this case is reviewed. He has filed twelve pleadings in this case after the initial complaint and amended complaint were filed. *See* ECF Nos. 8, 10, 13, 14, 16, 17, 18, 23, 25, 26, 30, and 34. Although the Court has reservations about a prison policy to

withhold legal envelopes as a general practice,[5] there has been no showing in this case that Plaintiff has been harmed by the practice. Additionally, the violation of prison regulations regarding the handling of legal mail, *i.e.*, that it must be opened in the inmate's presence, is not enough alone for this Court to intervene into the management of the prison mail room. *See Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir.1990) (requiring a showing of improper motive or interference with access to courts); *Buie v. Jones* 717 F. 2d 925, 926 (4th Cir. 1983) (isolated incident of mishandling does not show actionable pattern or practice). Accordingly, the motion shall be denied.

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*,

---

[5] It is not difficult to imagine circumstances where the envelope in which legal mail is received would be important evidence for a prisoner-litigant to access in order to establish the date of his actual receipt of any given item. *See, Houston v. Lack*, 487 U.S. 266 (1988); *Lewis v. Richmond City Police Department*, 947 F.2d 733, 734-35 (4th Cir. 1991); *United States v. Dorsey*, 988 F. Supp. 917, 919-920 (D. Md. 1998).

346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the non-movant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

### Medical Claims

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with

unqualified access to health care).   Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) quoting *Farmer* 511 U.S. at 844.  If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Defendants in the instant case are correctional staff, charged with maintaining the security of the prison, and the Warden.  There are no members of the medical staff named as Defendants.  Thus, it appears Plaintiff's theory of liability is that Defendants have prevented him from receiving medical care to address a serious medical condition of which they were aware.  The record evidence establishes that Plaintiff has received constitutionally adequate medical care.

With respect to Plaintiff's complaints about his throat, he has been examined repeatedly.  On September 15, 2011, Plaintiff was seen for neck pain, claiming he had an old injury to his

neck and had recently fallen, re-injuring it. ECF No. 32 at Ex. 21, pp. 55 – 56. Plaintiff was examined by Physician's Assistant Moss who noted that the more questions he asked Plaintiff about his neck, the more his story changed regarding the injury. *Id*. at p. 55. Additionally, Plaintiff refused to allow Moss to fully examine his neck and he refused to move his neck. When Moss asked Plaintiff if he could move his neck, Plaintiff shook his head "no." *Id*. On September 26, 2011, Plaintiff was sent to an outside hospital after he was found in his cell unconscious.[6] *Id*. at p. 38. After regaining consciousness Plaintiff refused to speak, but indicated his throat was injured. A CT Scan was performed and yielded normal results. A toxicology screen was also performed and came back with negative results. *Id*. Because Plaintiff continued to refuse to speak, he was referred for a psychiatric consultation, but Plaintiff refused to be seen.

Plaintiff asserts that the diagnosis regarding his throat has changed from normal to "prominent epiglottis," proving Defendants have lied about the condition of his throat. ECF No. 1. Plaintiff's interpretation of the evidence is mistaken. A "prominent epiglottis" is not a change in the diagnosis of "normal." Rather, it simply more fully describes the anatomy of Plaintiff's throat. Even if this represented a change in the diagnosis, the named Defendants had no participation in the diagnosis and made no effort to prevent Plaintiff from receiving medical care for his complaint.

Following his evaluation at the hospital, Plaintiff was seen again for complaints regarding his throat and chest tightness on November 11, 2011. ECF No. 32 at Ex. 21, p. 34. On November 13, 2011, he reported that he suffered from heart disease when he was 10 years old. *Id*. at pp. 30 – 31. Because he was not exhibiting any symptoms of a cardiac issue, Plaintiff was

---

[6] On October 4, 2011, Plaintiff reported to medical staff that he had a seizure disorder. No history of seizures were noted in his medical file. ECF No. 32 at Ex. 21, pp. 46 – 54.

offered Maalox which he refused. When he became difficult, he requested to return to his cell. On November 15, 2011, Plaintiff was put on a cardiovascular diet for a period of three months. *Id*. at pp. 29 and 88. He reported again on November 16, 2011, that he was having chest pains. *Id*. at pp. 26 – 28. When Plaintiff again complained of chest pain in December, x-rays of his chest were performed and no abnormalities were noted. *Id*. at pp. 12 – 23. Plaintiff was instructed not to eat and lay down, but to sit upright or stand for two to three hours after eating. *Id*. at p. 12. On January 5, 2012, Plaintiff refused the cardiovascular diet and signed a release of responsibility. *Id*. at p. 72. There is no evidence that Plaintiff's complaints regarding chest pains were ignored or that Defendants prevented him from seeking or receiving care.

Plaintiff's complaints of headaches were also adequately addressed. On October 19, 2010, Plaintiff was seen by P.A. Moss for headaches and was provided Ibuprofen. ECF No. 32 at Ex. 21, pp. 67 – 68. On December 8, 2010, Plaintiff was again seen for a complaint of migraines and nosebleeds. *Id*. at pp. 65 – 66. Nurse Practitioner Maximuangu examined Plaintiff and noted that the nasal septum was red and inflamed, but was not bleeding. *Id*. He was prescribed Excedrin Migraine[7] for his headaches as well as Afrin nasal spray for his nasal passages. He was told to return in 14 days if the headaches worsened or did not improve. *Id*. When Plaintiff reported that he was suffering headaches on January 5, 2011, he did not appear to be in distress and his request for a "brain exam" was denied. ECF No. 32 at Ex. 21, pp. 10 – 11. He was told, however, to follow up within 10 days if his condition did not improve or worsened. *Id*.

---

[7] Plaintiff reported that he did not like the way Excedrin Migraine made him feel and that he had difficulty sleeping when taking it. It was therefore discontinued and new pain relief, Ibuprofen, was prescribed. ECF No. 32 at Ex. 21, pp. 63 – 64.

Plaintiff's claim that he should be evaluated for a possible brain tumor because he has headaches, without some evidence that he is suffering other neurological symptoms warranting an objective concern regarding that possibility, is not an adequate basis for a constitutional claim. His assertion is simply his disagreement with the medical care provided. He has offered no evidence that the named Defendants knew or should know that he requires evaluation for a brain tumor, nor has he demonstrated that they have interfered with medically prescribed treatment. Defendants are entitled to summary judgment on this claim.[8]

### Conditions Claim

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U. S. at

---

[8] Plaintiff has also been offered psychiatric care on numerous occasions, but he has rejected all opportunities to participate in such care. Indeed, he does not allege in his Complaint or any subsequently filed documents that he requires psychiatric care and is not receiving same.

10

298. In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. North Carolina Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010), quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir.2002). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law. *See Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir.2003). Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of a serious or significant physical or emotional injury resulting from the challenged conditions. *See Odom v. South Carolina Dept. of Corrections*, 349 F. 3d 765, 770 (4th Cir. 2003).

Plaintiff's claims regarding the conditions of his confinement concern the allegation that both correctional officers and other inmates are poisoning his food. Defendants unequivocally deny any knowledge of the claims asserted. ECF No. 32 at Ex. 2 – 7. Plaintiff alleges that cameras on the housing unit tier should have recorded acts of food tampering and urges this Court to require Defendants to produce the recordings for this Court to review. Before that occurs, however, Plaintiff must establish a prima facie case that he has been subjected to conditions violating the Eighth Amendment. This, he has not done. There is no evidence that Plaintiff has suffered "serious or significant physical or emotional injury" as a result of the

alleged tampering with his food. He has declined all efforts to cooperate with psychiatric care, insisting he does not need same, and does not attribute any of his claimed medical issues to the claimed food tampering. Accordingly, Defendants are entitled to summary judgment on this claim.

### Failure to Protect Claim

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm. *Pressly v. Hutto*, 816 F. 2d 977, 979 (4th Cir. 1987). "Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833– 34 (1994) (citations omitted). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id* at 837. *See also Rich v. Bruce*, 129 F. 3d 336, 339– 40 (4th Cir. 1997).

Plaintiff claims that he is assigned to administrative segregation because it is used in place of protective custody at JCI. He asserts that allowing essentially any other inmate to be out of their cell during times when food is served presents an unreasonable risk of harm to him. Defendants state that Plaintiff has two documented enemies, neither of whom is housed at JCI with him. ECF No. 32 at Ex. 22. There is no evidence that any of the inmate workers Plaintiff

references are known to be a threat to him or that Defendants have ignored a substantial risk of serious harm to him. The claims must fail.

A separate Order granting summary judgment in Defendants' favor follows.

/s/
PETER J. MESSITTE
October 18, 2012                    UNITED STATES DISTRICT JUDGE